UNITED STATES COURT OF APPEALS
**Filed 1/10/97**
FOR THE TENTH CIRCUIT

VERL D. HAVICE,

      Plaintiff-Appellant,

v.

SHIRLEY S. CHATER,
Commissioner, Social Security
Administration,[*]

      Defendant-Appellee.

No. 96-5074
(D.C. No. CV-94-953-W)
(N.D. Okla.)

ORDER AND JUDGMENT[**]

Before EBEL and HENRY, Circuit Judges, and DOWNES,[***] District Judge.

---

[*]     Effective March 31, 1995, the functions of the Secretary of Health and Human Services in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. Pursuant to Fed. R. App. P. 43(c), Shirley S. Chater, Commissioner of Social Security, is substituted for Donna E. Shalala, Secretary of Health and Human Services, as the defendant in this action. Although we have substituted the Commissioner for the Secretary in the caption, in the text we continue to refer to the Secretary because she was the appropriate party at the time of the underlying decision.

[**]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[***]     Honorable William F. Downes, District Judge, United States District Court for the District of Wyoming, sitting by designation.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Claimant Verl D. Havice appeals the district court's affirmance of the decision by the Secretary of Health and Human Services finding that claimant did not become totally disabled until October 5, 1992, five days after his insured status expired. Because the Secretary's decision that claimant could perform a significant number of jobs before October 5, 1992, is not supported by substantial evidence, we reverse and remand for an immediate award of benefits.

Claimant was born in January 1939, and attended school through the eighth grade, taking several years of evening classes thereafter. He did not graduate high school or obtain a GED. After military service, claimant worked full-time as an automobile assembler until 1969, then as a truck mechanic, driver, welder, and painter for a crane manufacturing company until 1982. He worked as a diesel mechanic through 1984, and, after a year and a half interruption, worked for a temporary employment agency at a bottling plant and as a delivery driver. Claimant stopped working due to his physical condition in April, 1988, and has not worked since.

In 1965, claimant broke his right patella in a car accident. His knee was repaired by open reduction and internal fixation, using two wires to maintain the reduction. Several months later, claimant fell and refractured the patella. In 1977, claimant was injured in an explosion at work, sustaining second and third degree burns to both legs which required skin grafts. In 1978, he was diagnosed with diabetes mellitus, controlled with insulin injections and limited diet. He was also diagnosed with hypertension, controlled with medication. In 1979, claimant was examined by orthopedic surgeon Sisler for intermittent episodes of low back pain, stemming from the 1977 explosion. Dr. Sisler diagnosed claimant with chronic strain, noting that the x-rays showed latent disc manifestations.

In July 1985, claimant was diagnosed with right-sided Bell's Palsy, which included paralysis of the face, tinnitus of the right ear, reduced balance and right arm weakness. Most of these symptoms resolved after several months, except for persistent tinnitus in the right ear. In December 1985, claimant was diagnosed with left-sided Bell's Palsy, which again took several months to resolve.

In December 1987, claimant slipped and fell on the ice, injuring his right knee and elbow. He was treated for several months by Dr. McCreight for right knee pain, occasional give-way weakness, and "popping" with ambulation. Based on x-rays, Dr. McCreight diagnosed moderate osteoarthritis of the right knee, and referred claimant to orthopedic surgeon Sisler for further evaluation.

In April 1988, Dr. Sisler's examination revealed right knee swelling, increased temperature, reduced range of motion, crepitation, tenderness, and bony irregularity of the patella.  R. II-A at 284.  Upon reviewing claimant's January 1988 x-rays, Dr. Sisler noted "degenerative changes . . . along the medial femoral and tibial condyles with slight narrowing of the medial joint space . . . [and] slight irregularity on the articulating surface of the patella with a small osteophyte at the inferior pole."  Id.  The wires from claimant's earlier patellar surgery appeared intact.  In April 1988, claimant's x-rays showed

> osteophytes on the adjacent sides of the medial femoral and tibial condyle and sharpening of the tibial spines . . . [and] changes on the lateral tibial plateau [].  On the tangential view there are spurs along the medial condyle of the femur at the patellofemoral joint.  The AP view shows the larger wire appears to have broken in the interval between the film taken on 1/18/88 . . . and the film taken today.

Id.  Based on claimant's reports of catching and giving way of the knee, Dr. Sisler opined that there was motion about the end of the wire causing it to break.  In May 1988, Dr. Sisler performed arthroscopic surgery on claimant's knee, removing the broken wire and debriding several cartilagenous surfaces.  The surgeon noted degenerative arthritic changes in the knee, including moderately advanced chrondomalacia (deterioration of weight-bearing cartilage) involving the patella and the medial and lateral femoral condyles, and thickening of the synovium in the patellar pouch.  Id. at 270, 279, 283.

During the months after surgery, Dr. Sisler noted swelling, limited range of motion, moderate crepitation, continued instability, and giving way in the right knee. On July 22, 1988, the surgeon released claimant to perform "work of [a] moderate nature which would include being on his feet 50 percent of the time but minimal climbing and no squatting or kneeling." Id. at 279.

In November 1988, claimant returned to Dr. Sisler with complaints of continued knee instability. A series of six x-ray views showed:

> moderately advanced arthritic changes in the joint noted particularly along the medial sides of the femur and tibia. When the films are compared to the films of 4/14/88, there appears to be some progression of the size of the osteophytes particularly on the medial side.

Id. at 278. Dr. Sisler opined that claimant's symptoms were those of traumatic arthritis, and that, although he still walked well, the symptoms were slowly progressing. The surgeon opined that claimant was unable to work at that time.

In April 1989, claimant was examined by consulting physician Sullivan, who found deformity of the right knee with detectible osteophytes, reduced range of motion, and mild subpatellar crepitation; bilateral diffuse tenderness of the cervical spine, trapezius, and lumbar sacral spine; and distinctly decreased sensation in the feet bilaterally. Dr. Sullivan diagnosed traumatic arthritis to the right knee, mild osteoarthritis in the cervical and lumbosacral spines and in

-5-

scattered joints, very mild peripheral neuropathy of the feet due to diabetes, and the ongoing conditions of diabetes and hypertension.  He opined that

> [Claimant] has chronic problems with traumatic arthritis of the right knee which prevent him from pursuing work that involves a great deal of physical labor or being on his feet.  He cannot . . . squat or climb stairs or ladders.  He is none-the-less, able to walk perfectly adequately.  He is thus fully capable of performing sedentary labor where he is sitting, most of the time. . . . He should be considered disabled for any work involving hard, physical labor, or work that requires standing for many hours at a time.

Id. at 321.

Dr. Sisler again examined claimant in late August 1989, noting both physical and x-ray evidence of deterioration.  The surgeon observed that claimant had difficulty arising from a seated position, had a considerable limp when bearing weight on the right leg, had considerable difficulty squatting and ascending a step, and had limited range of motion, audible and palpable crepitation, and tenderness in the right knee.  The x-rays showed moderate osteophytes involving the medial and lateral joint compartments, and large osteophytes on the superior and inferior poles of the patella.  Dr. Sisler concluded that "[t]he films are interpreted as showing panarthrosis of the right knee joint," and that claimant was suffering from "[d]egenerative/traumatic arthritis involving all three compartments of the right knee." Id. at 336-37.  He opined that

> [Claimant] has advanced traumatic arthritis of the right knee. . . .
> With time and continued use, the traumatic arthritis has progressed to the point he is no longer able to function.  Sitting for long periods of

-6-

time while driving is very painful. Standing, walking and stair climbing are also very painful. Furthermore, there are medical problems of hypertension and diabetes which add additional restraints to his well being, stamina and functional capacity.

Id. at 337.

In November 1989, claimant was examined by consulting physician McKenzie, who observed that claimant walked stiff-legged and favored the right knee, that the knee was swollen and significantly tender with a reduced range of motion and loss of strength, and that claimant's neck had a limited range of motion with paraspinous muscle tenderness. Dr. McKenzie's review of claimant's x-rays revealed "severe arthritis of the right knee, [and] irregularity of the right patella with osteophyte at the inferior pole." Id. at 366. Dr. McKenzie concluded that claimant had been totally disabled from April to July, 1988, and from August 1989 to the date of the current exam, and that he had a total permanent impairment to the right lower extremity of 53.5%, and a 10% impairment based on claimant's neck.

In August 1990, Dr. Sisler again examined claimant and took x-rays of his cervical spine and right knee. The surgeon found claimant's cervical spine range of motion to be about fifty percent of normal, and noted obvious swelling and joint effusion in claimant's knee, ambulation with a distinct limp, reduced range of motion, inability to squat, palpable osteophytes and tenderness, and audible and palpable crepitation during knee motion. Sisler reaffirmed his diagnosis of

traumatic arthritis, and opined that claimant suffered from chronic strain of the cervical spine. R. II-B at 412-13.

Claimant was also treated from July 1985 to March 1993 by the Veterans Administration. VA medical records indicate ongoing treatment for diabetes and hypertension, as well as treatment for Bell's Palsy, headaches, cervical pain, low back pain, dizziness, neuropathy, and various infections. In March 1989, claimant's records began noting swelling of the lower extremities, and by September 1989, he was being advised to wear support socks and to elevate his legs. R. II-A at 353, 356. In January, 1989, degenerative changes of the spine were noted. R. II-B at 505. Although such changes were not noted in his December 1989 x-rays, x-rays in March 1991 showed "[d]egenerative change with L3-L4 disk space narrowing and prominent hyperstosis anterior superior margin right side of L3 vertebral body." Id. at 503-04.

In November 1991, and again in January 1992, the VA observed that claimant limped and had bilateral leg pain that worsened when walking. Id. at 494-95. In May 1992, claimant developed cellulitis of the left leg, with redness, marked swelling, and impaired skin integrity. After hospitalization, claimant continued to receive treatment for these symptoms through October 1992, with frequent instructions to elevate his legs. Thereafter, claimant's records show swelling and pain in both legs. In August 1992, claimant was seen for right knee

pain, and x-rays were taken. The VA staff radiologist noted "moderately severe degenerative changes" in the femur and tibia, and particularly in the medial tibial plateau. Id. at 472. Comparing the 1992 x-rays to one taken in 1986, the radiologist concluded that claimant's degenerative changes were "fairly stable since 2-20-86." Id. In October 1992, the VA discovered that claimant's neuropathy had reached his bladder, requiring frequent self-catheterization. In December 1992, the VA diagnosed a cochlear lesion, explaining claimant's intermittent complaints of dizziness and tinnitus.

In May 1993, claimant was examined by consulting physician Dandridge, who noted that he walked with an unsteady gait and a slight limp on the right, had restricted range of motion in the cervical spine, moderate swelling and pitting edema in both legs, restricted motion in both knees, especially the right, restricted motion of the right hip, hypesthesia over both arms and legs, and limited ability to squat. Dr. Dandridge opined that claimant could only stand and walk one hour per day, could sit for six hours, could lift and carry 11-20 pounds occasionally, could bend and reach occasionally, but could not use the right leg for pushing and pulling controls, and could not squat, crawl, or climb. Id. at 534-39.

Claimant filed for disability insurance benefits and supplemental security income (SSI) in February 1989, alleging an inability to work after April 1988. In May 1990, after two administrative hearings, an administrative law judge (ALJ)

issued a decision finding claimant capable of performing light work. In December 1991, the district court remanded the case to the Secretary, holding that the record did not support the ALJ's conclusion.

Almost two years later, in October 1993, a supplemental hearing was held on claimant's application. After the hearing, at which a vocational expert testified, the ALJ again found claimant capable of performing light work, including the jobs of light tool maintenance worker, light template maker, and production checker/tester. The ALJ found that claimant retained this ability until October 5, 1992, when his bladder condition rendered him disabled. Because claimant's insured status lapsed on September 30, 1992, the ALJ found that claimant was not eligible for disability insurance benefits, but that he might be eligible for SSI payments after that date. The Appeals Council denied review, making this the final decision of the Secretary. The district court affirmed, finding that although the record did not support a conclusion that claimant could do light work, there was evidence that he remained capable of performing sedentary work such as production line assembly and stock and inventory work. This appeal followed.

We review the Secretary's decision to determine whether her factual findings are supported by substantial evidence and whether correct legal standards were applied. Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027,

-10-

1028 (10th Cir. 1994). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). We may "neither reweigh the evidence nor substitute our judgment" for that of the Secretary. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991).

Claimant argues that substantial evidence does not support the Secretary's decision that he could do light work before October 5, 1992, or the district court's conclusion that he could perform skilled sedentary work before that date, and that he is entitled to disability benefits as a matter of law. We agree.

Claimant's Ability to Perform Light Work

Light work generally requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Soc. Sec. Rul. 83-10. To find that claimant retained the ability to perform light work, the ALJ rejected the opinions of both Dr. Sisler and Dr. Sullivan that claimant could not stand and walk on a prolonged basis. The ALJ found that these opinions were inconsistent with the doctors' findings that claimant walked well, accepting instead the VA radiologist's statement that claimant's knee condition had remained stable since February 1986. Neither of

these reasons provided a legitimate basis for rejecting the opinions of Dr. Sisler or Dr. Sullivan.

First, the observation that claimant still walked well was not inconsistent with the ultimate opinion that claimant could not perform work requiring prolonged standing and walking. Claimant's ability to walk is a separate question from his ability to perform such activity on a sustained basis. See, e.g., Ragland v. Shalala, 992 F.2d 1056, 1059 (10th Cir. 1993)(holding "[t]he fact that plaintiff may intermit a tiring or painful upright task with periods of seated rest . . . does not entail any particular answer to the separate question whether she can remain seated for a prolonged period of time").

Further, by August 1989, every medical source observed that claimant experienced difficulty walking. See, e.g., R. IIA at 336 (8/22/89 - considerable limp); 350 (12/22/89 - acts uncomfortable when walking); 365 (11/14/89 - stiff-legged gait favoring right knee); R. IIB at 413 (8/28/90 - ambulates with distinct limp); 494-95 (11/29/91 and 1/31/92 - noting claimant's limp); 534 (5/28/93 - unsteady gait with a slight limp). Finally, the ALJ mischaracterized Dr. Sisler's office notes of April 1988, by stating that he found claimant's knee to be asymptomatic. Dr. Sisler actually reported that claimant's knee had been asymptomatic before he fell in December 1987, but that he became symptomatic after injuring the knee in the fall. The ALJ erred, therefore, in finding that the

opinions of Dr. Sisler and Dr. Sullivan were internally inconsistent with their medical findings regarding claimant's knee.

It was also improper to reject Dr. Sisler's findings and opinions based on the VA radiologist's statement that claimant's knee had remained stable since February 1986. Dr. Sisler was claimant's treating orthopedist. A treating physician's opinion about the nature and severity of a claimant's impairment will be given controlling weight if it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. 404.1527(d)(2); Castellano, 26 F.3d at 1029. If the treating physician's opinion is inconsistent with other medical evidence, the ALJ must "examine the other physicians' reports to see if they 'outweigh[ ]' the treating physician's report, not the other way around." Goatcher v. United States Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th 1995)(quotations omitted). In addition, the ALJ must consider the following specific factors to determine what weight to give a medical opinion:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id.; 20 C.F.R. § 404.1527(d)(2)-(6).

Here, Dr. Sisler treated claimant's knee comprehensively for two and a half years. He physically examined the knee on eleven occasions, took x-rays on five occasions, compared a total of twenty-two views of claimant's knee, and personally observed the degenerative changes during arthroscopic surgery. His opinion is consistent with that of every other physician who examined claimant, and is consistent with the signs and symptoms of deterioration noted over the years. In addition, he is a specialist in the area in which he rendered his opinion.

In contrast, the VA records do not show treatment of claimant's knee before August 1992, and do not reflect that x-rays were taken in February 1986. The radiologist who opined that claimant's knee remained stable during these years never physically examined claimant. Even assuming the existence of the 1986 x-rays, there is no evidence that the radiologist, who only looked at two views of claimant's knee in 1992, was looking at the same areas as those identified by Dr. Sisler, who took as many as six x-ray views at a time. In addition, the radiologist's opinion is inconsistent with all the other medical evidence. On this record, it is impossible to conclude that the radiologist's opinion outweighs that of Dr. Sisler, and the ALJ erred in rejecting the treating physician's opinion. The record overwhelmingly supports Dr. Sisler's opinion that claimant was incapable of prolonged standing and walking after July 22,

-14-

1988.  The Secretary's conclusion that claimant could perform light work, therefore, is unsupported by substantial evidence.

## Claimant's Ability to Perform Sedentary Work

There is no doubt that when claimant was released for work on July 22, 1988, he remained capable of performing sedentary work, and was therefore not disabled.  On January 26, 1989, however, plaintiff turned fifty years old, and moved into the category of persons "closely approaching advanced age," according to the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P. App. 2 (the grids).  The grids are a collection of administratively noticed rules directing a conclusion of "disabled" or "not disabled," based on a claimant's age, education, residual functional capacity, and transferable skills.  After January 26, 1989, given claimant's age, limited education, and capacity to do sedentary work, the grids directed a conclusion of "disabled" if he lacked transferable skills, but "not disabled" if he had such transferable skills.  Id., Rules 201.10, 201.11.

The district court concluded, based on the vocational expert's testimony, that claimant was not disabled because he had skills which would transfer to production assembly work and stock and inventory work.  R. I at 22.  It is true that, at the hearing, the vocational expert testified that claimant had such transferable skills.  On cross-examination, however, she retracted both these

statements, after being informed that claimant's past assembly work occurred more than fifteen years earlier, and upon noting that claimant lacked training in the computer technologies currently used in stock and inventory work. See R. II-B at 626-27, 633-34. There is no substantial evidence, therefore, upon which to base a finding that claimant had transferable skills. In the absence of such skills, Rule 201.10 of the grids directs a conclusion that claimant became disabled when he turned fifty years old.

Claimant filed his application for disability benefits almost eight years ago. After three hearings, the Secretary still has not met her burden of showing that claimant retained the ability to perform a significant number of jobs in the economy after January 26, 1989. "The Secretary is not entitled to adjudicate a case 'ad infinitum until [she] correctly applies the proper legal standard and gathers evidence to support [her] conclusion.'" Sisco v. United States Dep't of Health & Human Servs, 10 F.3d 739, 746 (10th Cir. 1993)(quoting Thaete v. Shalala, 826 F. Supp. 1250, 1252 (D. Colo. 1993)). The case is remanded, therefore, for an immediate award of disability benefits to claimant, commencing on January 26, 1989. The Social Security Administration is also directed to determine whether claimant met the nondisability criteria for an award of SSI payments after that date, and is to do so with all deliberate speed.

The judgment of the United States District Court for the Northern District of Oklahoma is REVERSED, and the case is REMANDED for an immediate award of benefits and for such other proceedings as may be necessary.

Entered for the Court

William F. Downes
District Judge